IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Kenneth Riley,<br><br>   *Plaintiff,*<br><br> v.<br><br>Borough of Eddystone, et al,<br><br>   *Defendants.* | CIVIL ACTION<br>NO. 24-1835 |

**Pappert, J.**                                 November 20, 2024

<u>**MEMORANDUM**</u>

  Kenneth Riley sued the Borough of Eddystone and five of its officials, asserting various claims arising out of Riley's termination from his job as a trashman. The Court previously dismissed Riley's claims under Title VII of the Civil Rights Act but granted him leave to amend. Riley did so, and the Borough moved to dismiss the Amended Complaint. The Court grants the motion as to Riley's hostile-work-environment claim, which is dismissed with prejudice, and denies the motion as to his intentional-discrimination and retaliation claims.

I

  The Court in its previous opinion recounted the initial Complaint's relevant allegations. *See Riley v. Borough of Eddystone*, No. CV 24-1835, 2024 WL 4137310, at *1–2 (E.D. Pa. Sept. 10, 2024). The Amended Complaint is largely more of the same, with the additional allegation that John Caponi is the previously unidentified individual who called Riley the N-word—specifically, Caponi allegedly referred to Riley as "my N---a." (Am. Compl. ¶¶ 30–31, ECF No. 21.)

1

II

To avoid dismissal under Rule 12(b)(6), a complaint must contain facts sufficient to state a claim that is facially "plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the factual allegations permit a court to make the reasonable inference that the defendant is liable for the alleged misconduct. *Id.* The "mere possibility of misconduct" is not enough; the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678–79 (quoting *Twombly*, 550 U.S. at 570).

Determining plausibility is a "context-specific task" requiring a court to use its "judicial experience and common sense." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786–87 (3d Cir. 2016)). In making this determination, the court assumes well-pleaded facts are true, construes those facts in the light most favorable to the plaintiff, and draws reasonable inferences from them. *Id.* at 790. The plaintiff need only allege enough facts to "raise a reasonable expectation that discovery will reveal evidence" of each element of his claim. *Id.* at 788–89. But "[c]onclusory assertions of fact and legal conclusions," are not entitled to the presumption of truth. *Schuchardt v. President of the United States*, 839 F.3d 336, 347 (3d Cir. 2016). So "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678, (quoting *Twombly*, 550 U.S. at 555).

III

To establish a *prima facie* case of intentional discrimination under Title VII, a plaintiff must show that (1) he is a member of a protected class, (2) he was qualified for

2

his position; (3) he suffered an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of intentional discrimination. *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 169 (3d Cir. 2013).  The only dispute is whether Riley has alleged enough facts to "raise a reasonable expectation that discovery will reveal evidence" raising an inference of discrimination.  *See Connelly*, 809 F.3d at 788–89, 791.

An inference of discrimination is not the product of a "rigid, mechanized, or ritualistic" inquiry; instead, courts evaluate facts "in light of common experience." *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 (3d Cir. 1999).  An inference of discrimination "could be supported in a number of ways, including, but not limited to, comparator evidence, evidence of similar racial discrimination of other employees, or direct evidence of discrimination from statements or actions by her supervisors suggesting racial animus." *Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 703 n.2 (3d Cir. 2010).  A plaintiff might also support the inference by alleging that he was replaced by an individual outside of his protected class.  *Johnson v. Keebler-Sunshine Biscuits, Inc.*, 214 F. App'x 239, 242 (3d Cir. 2007).

Riley, who is black, alleges that he repeatedly brought to the attention of his supervisors three racist comments by two co-workers.  (Am. Compl. ¶¶ 30–35, 37, 46, 50, 62.)  The comments included, we now know, Caponi using the N-word to refer to Riley.  (*Id.* ¶ 31.)  Riley says his superiors failed to address the comments, and then a week after Riley reported the comments publicly, his superiors cancelled his shifts indefinitely before firing him[1] and replaced him with a non-black worker.  (*Id.* ¶¶ 40,

---

[1] In alleging that his firing was discriminatory, Riley has not clarified whether he means to rely on the discriminatory animus of the Borough Councilmembers, who voted to fire him, or

62, 67, 76, 78, 80, 101.)  At this stage, these alleged facts create a reasonable expectation that discovery will reveal evidence sufficient to raise an inference of discrimination.

IV

Riley also asserts a hostile-work-environment racial discrimination claim, which has five elements: (1) the plaintiff suffered intentional discrimination because of his race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) there is a basis for employer liability. *Mandel*, 706 F.3d at 167.

Riley still has not alleged facts that could establish severe or pervasive discrimination.  Title VII is not a "general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  So discriminatory conduct only rises to the level of severe or pervasive if it is "extreme" enough to "alter the conditions of the victim's employment and create an abusive working environment." *Nitkin v. Main Line Health*, 67 F.4th 565, 570 (3d Cir. 2023) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)) (cleaned up).  To determine whether conduct rises to that level, a "court must consider the totality of the circumstances, including 'the frequency of the

---

Borough Manager Jones, who recommended he be fired.  (Am. Compl. ¶¶ 83, 76.)  To the extent Riley alleges that discriminatory animus by the Borough Council is the reason he was fired, Riley's allegations apply equally to each Councilmember who voted to terminate him, so the Court need not decide at this stage whether a majority of the Council must have harbored animus in order for the Borough to be liable, *Watson v. Borough of Susquehanna*, 532 F. App'x 233, 236 (3d Cir. 2013*)* (requiring majority for liability under § 1983), or whether only a deciding margin must have harbored animus, *see Jackson v. Lowndes Cnty. Sch. Dist.*, 126 F. Supp. 3d 772 (N.D. Miss. 2015).  To the extent Riley instead alleges cat's-paw liability premised on Jones's recommendation, that theory is also plausible at this stage because Jones's recommendation could have been a proximate cause of the firing.  *See Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011).

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Mandel*, 706 F.3d, at 168.  Also relevant is the alleged harasser's position, as "a supervisor's power and authority invests his or her harassing conduct with a particular threatening character." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998).

Taken together, the three comments by Riley's co-workers over the course of two-and-a-half months do not plausibly constitute severe or pervasive harassment.  None were made by supervisors, and no allegations about the circumstances or context of the comments suggest that they were threatening or humiliating, that they interfered with Riley's work, or that they otherwise changed the conditions of his employment.  Riley urges that no context for the comments is needed because Caponi called Riley "my N---a" and called another black person "N-----" in front of Riley, and "[a]ny use of 'N-----' by a white man towards a black man or woman, regardless of the context, is threatening and humiliating." (Am. Compl. ¶¶ 31, 33.)  The N-word's inherent odiousness is indisputable, but context is nevertheless crucial because courts must distinguish between the non-actionable "mere utterance of an ... epithet," *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor*, 477 U.S. at 67), and actionable uses of epithets, *see*, *e.g.*, *Castleberry v. STI Grp.*, 863 F.3d 259, 265 (3d Cir. 2017) (supervisor used N-word in front of plaintiff's co-workers while threatening to fire plaintiff); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 279–80 (4th Cir. 2015) (supervisor twice called plaintiff a "porch monkey" while angrily threatening to fire him); *Gates v. Bd. of*

5

*Educ. of the City of Chicago*, 916 F.3d 631 (7th Cir. 2019) (supervisor addressed plaintiff using N-word twice and threatened to write up his "black ass").[2]

V

Riley's final claim is for retaliation, which requires that (1) he engaged in protected employee activity; (2) the employer took an adverse employment action either after or contemporaneous with the protected activity; and (3) there is a causal connection between the protected activity and the adverse action. *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 193 (3d Cir. 2015).

A

The first element—protected activity—is satisfied if the plaintiff either participated in certain Title VII proceedings[3] or informally opposed discriminatory

---

[2] The Court also denies Riley's request for leave to amend this claim a second time because amendment would be both futile and inequitable. Leave to amend is futile when the amended complaint would still fail to state a claim upon which relief could be granted. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997). Riley has given the Court no reason to think that he can add any relevant allegations in a third attempt. He did not identify any such allegations in his request for leave to amend. And his Amended Complaint added only one allegation contextualizing the alleged harassment—identifying Caponi as the person who called him the N-word—despite the Court's emphasis in its prior opinion that it must consider "the frequency of the conduct; whether it was physically threatening or humiliating, or merely offensive; and whether it unreasonably interferes with the plaintiff's work." *Riley*, No. CV 24-1835, 2024 WL 4137310, at *3. Accordingly, the Court must conclude that Riley has no additional information that would make his hostile-work-environment claim cognizable.
    Even if Riley does have additional allegations in his back pocket, allowing him a third bite at the apple would countenance the discouraged "wait-and-see" approach to pleading, whereby plaintiffs allow courts to identify the flaws in their complaints before filling in the gaps. *See United States ex rel. Sirls v. Kindred Healthcare, Inc.*, 536 F. Supp. 3d 1, 6 (E.D. Pa. 2021) (citing *Jang v. Bos. Sci. Scimed, Inc.*, 729 F.3d 357, 368 (3d Cir. 2013)). The Court will not require the Borough to endure the costs of another round of amendment and briefing simply because Riley failed to "take[] his best shot from the get go." *Sirls*, 536 F. Supp. 3d at 6 (quoting *Zhang v. Royal Caribbean Cruises, Ltd.*, No. 19-20773-CIV, 2020 WL 1472302, at *2 (S.D. Fla. Mar. 26, 2020); *see also Arthur v. Maersk, Inc.*, 434 F.3d 196, 204 (3d Cir. 2006) ("When a party fails to take advantage of previous opportunities to amend, without adequate explanation, leave to amend is properly denied.").

[3] An employee has "participated" when "he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

6

conduct by the employer. *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006). In either case, the plaintiff must reasonably and in good faith believe that the employer conduct at issue was prohibited by Title VII. *Id.* Whether the plaintiff's belief was reasonable is judged without "saddl[ing the plaintiff] with all of the doctrinal twists and turns that a civil rights lawyer would need to navigate." *Kengerski v. Harper*, 6 F.4th 531, 540 (3d Cir. 2021); *see also E.E.O.C. v. Rite Way Serv., Inc.*, 819 F.3d 235, 242 (5th Cir. 2016) (analyzing reasonableness from the perspective of an employee "not instructed on Title VII law as a jury would be").

When the conduct the plaintiff opposes is an alleged hostile work environment, the plaintiff is protected against retaliation if the workplace was "in some striking distance of an actual hostile work environment," even when hindsight reveals that the environment was not hostile. *Kengerski*, 6 F.4th at 537. Courts must also be cognizant that employees have to put their employers on notice of harassment before the employer may be held liable for it in a hostile-work-environment claim. *See Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 293–94 (3d Cir. 1999). So an overly narrow view of when a workplace is within "striking distance" of hostility would place harassed employees in a dilemma: fail to report and your employer may be off the hook for the hostile work environment; report too early and your employer can fire you for it. *Cf. Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 279 (2009) (rejecting a construction of Title VII's antiretaliation provision that would "create a real dilemma for any knowledgeable employee"). That dilemma would contravene "[p]art of Title VII's purpose[,] to 'encourage employees to report harassing conduct before it

becomes severe or pervasive.'" *Kengerski*, 6 F.4th at 537 (quoting *Ellerth*, 524 U.S. at 764).

Riley has plausibly alleged his good-faith belief that he was subject to a hostile work environment in violation of Title VII.  And the Court cannot say at this stage that his belief was unreasonable when he reported it, even if in hindsight he was wrong. Riley says one of his co-workers used the N-word in his presence twice, including once in reference to Riley in particular.  (Am. Compl. ¶¶ 30–31.)  Given that the N-word may be English's most abhorrent term, *see United States v. Bartow*, 997 F.3d 203 (4th Cir. 2021) (collecting authority), it's plausible that Caponi's comments placed Riley's work environment within striking distance of a hostile one.  To hold otherwise would mean that Title VII permits an employer to fire a black employee for voicing objection to his white co-worker's use of the N-word to and around him.  Such a holding would certainly risk discouraging knowledgeable employees from reporting race-based harassment early.  Riley's reports constituted protected employee activity.

B

Riley has also plausibly alleged the second and third elements.  The second element requires that Riley have suffered a materially adverse action, meaning one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *See Daniels*, 776 F.3d at 196 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  A reduction of work hours and termination both qualify. *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 220 (3d Cir. 2017); *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007).  Thus, Riley suffered materially adverse actions when some of his individual shifts were cancelled

8

between January 31 and February 5; when his shifts were cancelled indefinitely beginning February 6; and when he was terminated on February 12. (Am. Compl. ¶¶ 57–61, 67, 83.)

The third element—a causal connection between the protected activity and the adverse action—is met when there is unduly suggestive temporal proximity between the protected activity and adverse action or when the circumstances as a whole suggest retaliatory animus. *Daniels*, 776 F.3d at 196. Borough Manager Jones first cancelled one of Riley's shifts eight days after he made a "formal report" to her about his co-workers' comments. (Am. Compl. ¶¶ 50, 57.) Less than a week later and mere hours after Riley spoke out about the comments publicly, she cancelled his shifts indefinitely. (*Id.* ¶ 62–67.) The timing of the shift cancellations and the escalation from individual cancellations to indefinite cancellation following Riley's public statements suggest retaliatory animus by Jones. As for the Council's decision to fire Riley, retaliatory animus by each Councilmember who voted in favor of firing can be inferred because only a week elapsed between Riley's public comments and the Council's vote, and the meeting at which the Council voted was apparently the next time the Council met and the soonest opportunity to vote on Riley's fate. (*Id.* ¶¶ 62, 76, 83–84.)

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
Gerald J. Pappert, J.
