IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Kenneth Riley,<br><br>   *Plaintiff,*<br><br> v.<br><br>Borough of Eddystone, et al.,<br><br>   *Defendants.* | CIVIL ACTION<br>NO. 24-1835 |

**Pappert, J.**                               May 22, 2025

<u>**MEMORANDUM**</u>

  Kenneth Riley says the Borough of Eddystone fired him because he is black and/or in retaliation for comments he says were protected by the First Amendment and Title VII. He sued the Borough for intentional discrimination and retaliation under Title VII and the Pennsylvania Human Rights Act,[1] and the Borough along with five of its officials for First Amendment retaliation under 42 U.S.C. § 1983. Each Defendant moves for summary judgment.

  The Court grants former Borough Manager Dawn Jones's motion because there is no evidence in the record that she influenced the decision to fire Riley in retaliation for his protected speech. The Court denies the motion by former Mayor Rob Yannuzzi and Councilmembers William Stewart, Randy Perry and Ronald Hughes because the jury needs to decide whether they voted to fire Riley in retaliation for his protected speech and because they are not entitled to qualified immunity. The Court denies the

---

[1]   He also brought a claim for hostile-work-environment discrimination, which the Court previously dismissed. *See Riley v. Borough of Eddystone*, No. CV 24-1835, 2024 WL 4844794, at *2–3, *3 n.2 (E.D. Pa. Nov. 20, 2024).

1

Borough's motion with respect to Riley's retaliation claims, but it grants the motion with respect to the intentional-discrimination claims because nothing in the record raises an inference that Riley was fired because of his race.

I

Riley worked for the Borough of Eddystone's Streets Department from early December 2023 until his termination on February 12, 2024.  (Minutes Dec. 11, 2023 Meeting, ECF No. 42-6); (Minutes Feb. 12, 2024 Meeting, ECF No. 42-10.)  The record indicates that Riley endured discriminatory treatment by his coworkers during his tenure, but also that he was far from a gold-star employee.

First, Riley says that about two weeks after he began, fellow new hire John Caponi "screamed out" the N-word after a car nearly collided with the garbage truck in which he and Riley were riding.  (Riley Dep. 99:16–23, 101:19–102:2, ECF No. 24-5.)  Second, Riley says that on January 17, coworker Mike Dugan told him that "once the blacks came to Eddystone, they messed up the neighborhood."  (*Id.* 333:12–334:10.)  And third, Riley says that sometime in January he was listening to music with Caponi and another coworker when Caponi — "bored" and "trying to be funny" — told Riley that he was "acting like a ni–" and then caught himself before finishing the N-word.  (*Id.* 130:21–131:2, 132:8–14, 134:19–135:1, 139:1–7.)

Riley's colleagues also apparently mistreated him in other ways.  He says the more senior employees refused to show him and Caponi the proper trash-collection route and even drove the route incorrectly to confuse them.  (*Id.* 82:7–23.)  He also says his truck stopped working right after he caught his coworker Chris Ropski "under [its] hood."  (*Id.* 109:15–113:22.)  He says he reported these incidents to Jones, (*id.* 93:14–

94:2, 111:8–112:3), and when his coworkers found out they labelled him a snitch and refused to work with him, (*id.* 124:19–125:10). And he says that when he asked his supervisor Norm Quinn whether newly posted instructions not to play video games at work were directed at him, Quinn "lost it," got "in his face," "scream[ed]" at him "in front of everybody," and then threatened to "fire [his] ass." (*Id.* 221:2–22.)

With respect to Riley's behavior, the record contains evidence of several instances of misconduct. One of Riley's coworkers reported in mid-January that he stole rock salt from the Streets Department to use at his and his neighbors' homes. (Jones Dep. 31:21–32:11, ECF No. 42-12.) And according to Quinn, Riley played "video games during work time," questioned Quinn's "authority" when he instructed the Streets staff not to play video games, and used his phone while driving the garbage truck and during other work hours. (Quinn Accident/Incident Statements, ECF No. 42-15.) Then, as friction between Riley and the other Streets staff mounted, Riley sought to make a record of his interactions with them and purchased a camera to wear on his body at work. (Riley Dep. 172:9–175:10.) Around this time Riley also threatened "to make [his colleagues'] lives hell" if the Borough fired him. (Quinn Dep. 14:2–10, ECF No. 42-15); (Quinn Accident/Incident Statements.)

Riley's behavior, particularly the threats, made his coworkers uncomfortable. (Quinn Dep. 14:11–23); (Jones Notes, ECF No. 43-11); (Jones Email Feb. 1, 2024 5:16 p.m., ECF No. 43-22 at 9.) Caponi ultimately resigned from the Streets Department in part because he could no longer tolerate Riley. (Caponi Dep. 19:18–24:22, ECF No. 42-24.) Word that Riley had threatened his coworkers reached Councilmembers Perry, Stewart, Michael Bannon and Rachel Walker in late January. *See* (Bannon Email Feb.

3

1, 2024 8:27 a.m., ECF No. 43-22 at 10); (Walker Email Feb. 1, 2024 8:33 a.m., ECF No. 43-22 at 9–10); (Stewart Dep. 10:14–23, ECF No. 42-21); (Jones Dep. 31:21–23.) Bannon emailed Jones on February 1 recommending that Riley be "immediately suspend[ed] . . . until the council meeting where he can be terminated." (Bannon Email Feb. 1, 2024 8:27 a.m.) Jones then placed the issue of Riley's potential termination on the agenda for the Borough Council's February 5 "workshop" meeting.[2] (Jones Dep. 41:19–42:5); (Feb. 5 Meeting Agenda at 2, ECF No. 42-9.) She also texted Riley on February 1 and told him not to come in the next day because the Borough didn't have enough work for him. (Riley Dep. 178:3–11); (Jones Aff., ECF No. 42-13.) Jones sent him similar texts on each of the following days until February 4. *See* (Riley Dep. 277:19–22); (Jones Aff.)

Riley says that upon receiving these texts from Jones, he sensed his termination might be imminent. (Riley Dep. 277:14–278:7.) He thought it was unfair for the Council to terminate him, so he attended the February 5 workshop meeting and said so. The meeting was recorded and is publicly available on the Borough's YouTube channel.[3] Though the audio is muffled, Riley can be heard recounting Dugan's comment that Eddystone has "gone downhill since the Blacks moved in" and Caponi's use of the N-word in the garbage truck; accusing Jones of sweeping these incidents under the rug; and complaining that he is being pushed out after being bullied and subjected to racism. *See* (Feb. 5 Council Meeting 26:30–31:30.)

---

[2] According to Jones, the Council holds a "workshop" meeting on the first Monday of each month, and on the second Monday it holds "the actual council meeting where a vote takes place on . . . agenda items." (Jones Dep. 40:1–7.)

[3] https://youtu.be/nRByQmKtHb0?si=RdCOvjvYLtYpFVzE&t=1580.

4

Between the February 5 workshop and the February 12 meeting, Councilmembers Hughes, Perry and Walker investigated Riley's claims of racist treatment and the Streets staff's complaints about his behavior. *See* (Riley Dep. 298:20–299:8); (Jones Dep. 42:23–45:8); (Hughes Dep. 18:3–19:6.) Then at the February 12 meeting, Councilmember Hughes moved for Riley's termination, Stewart seconded it, and Perry voted in favor of the motion. (Minutes Feb. 12 Meeting.) Councilmembers Hall, Walker and Bolton voted against termination, and Bannon abstained. (*Id.*). All four stated that they did not have enough information to conclude that Riley engaged in conduct warranting termination. (Bannon Dep. 16:1–19); (Hall Dep. 21:22–22:18); (Walker Dep. 29:6–9); (Bolton Dep. 16:19–17:18.) Mayor Yannuzzi cast the tiebreaking vote in favor of termination. (Minutes Feb. 12 Meeting.)

## II

Summary judgment is appropriate if the movant shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Liberty Mut. Ins. Co. v. Sweeney*, 689 F.3d 288, 292 (3d Cir. 2012). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if, based on the evidence, "a reasonable jury could return a verdict for the nonmoving party." *Id.*

The movant bears the initial burden of demonstrating the absence of a genuine dispute of a material fact. *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016). When the movant is the defendant, they have the burden of demonstrating that the plaintiff "has failed to establish one or more essential elements of [his] case."

5

*Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013).  If the movant sustains this initial burden, "the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  The Court's role is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial.  *See Anderson*, 477 U.S. at 249; *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007).  In doing so, the Court must construe the facts in the light most favorable to the non-moving party.  *See Horsehead Indus., Inc. v. Paramount Commc'ns, Inc.*, 258 F.3d 132, 140 (3d Cir. 2001).

### III

Riley sued all Defendants under § 1983 for First Amendment Retaliation.  The Court's analysis proceeds two parts.  First, the Court must "identify the exact contours of the underlying right" and determine whether a jury could conclude that Riley was deprived of that right.  *See Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015).  Second, the Court must determine which Defendants, if any, may be liable for that deprivation.

### A

To establish a claim for First Amendment retaliation, Riley must show that (1) he engaged in "constitutionally protected conduct," (2) he was subject to "retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights," and (3) "a causal link existed between the constitutionally

protected conduct and the retaliatory action." *Palardy v. Twp. of Millburn*, 906 F.3d 76, 80–81 (3d Cir. 2018) (cleaned up). Everyone agrees that Riley's termination is an action sufficient to deter a person of ordinary firmness, so only the first and third elements are in dispute.[4]

1

Speech by a public employee is protected if (1) the employee spoke as a citizen and not an employee, (2) the speech involved a matter of public concern, and (3) the government lacked an adequate justification for treating the employee differently than a member of the public based on its concerns as an employer. *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 466 (3d Cir. 2015). Whether a public employee's speech is protected is a question of law for the Court to answer. *Fenico v. City of Philadelphia*, 70 F.4th 151, 162 (3d Cir. 2023).

First, a public employee speaks as a citizen if the speech in question is not "ordinarily within the scope of [his job] duties." *Lane v. Franks*, 573 U.S. 228, 240 (2014). No Defendant adduced evidence that Riley's duties as a Streets Department worker ordinarily involved speaking to the Council and public about his work environment. Jones argues instead that Riley spoke as an employee because "his allegations of racism were rooted in his employment experience." (Jones Mot. 6–7, ECF No. 41.) But "the mere fact that a citizen's speech concerns information acquired by

---

[4] At the motion-to-dismiss stage, the Court held that the cancellation of Riley's shifts immediately following Riley's speech could also plausibly constitute retaliation. *Riley v. Borough of Eddystone*, No. CV 24-1835, 2024 WL 4137310, at *6 (E.D. Pa. Sept. 10, 2024. Riley now pursues retaliation claims based only his termination. *See* (Resp. to Jones 8–9, ECF No. 46); (Tr. Oral Arg. 76:11–14.)

7

virtue of his public employment does not transform that speech into employee — rather than citizen — speech." *Lane*, 573 U.S. at 240.

Second, speech involves a matter of public concern if, based on its "content, form, and context," it "can be fairly considered as relating to any matter of political, social, or other concern to the community" or "is a subject of legitimate news interest." *Id.* at 241. The speaker's motive for speaking is relevant but not dispositive in the analysis. *Azzaro v. Cnty. of Allegheny*, 110 F.3d 968, 978 (3d Cir. 1997).

The subject matter of Riley's speech at the February 5 meeting was, at least in part, racial discrimination he allegedly suffered at the hands of his coworkers and alleged refusals by his superiors to do anything about it. *See* (Feb. 5 Council Meeting 26:30–31:30.) Discrimination by public servants on the basis of arbitrary characteristics like race is undoubtedly a matter of concern to the community, regardless of whether the alleged discrimination is a systemic problem. *Rode v. Dellarciprete*, 845 F.2d 1195, 1201–02 (3d Cir. 1988); *Connick v. Myers*, 461 U.S. 138, 148 n.8 (1983); *see also Azzaro*, 110 F.3d at 978, 980; *Starnes v. Butler Cnty. Ct. of Common Pleas, 50th Jud. Dist.*, 971 F.3d 416, 429 (3d Cir. 2020). The Defendants don't seriously dispute this, arguing instead that the form and context of Riley's speech render it a mere "personal grievance" in which the public has no real interest. (Jones Mot. 7); (Borough Defs.' Mot. 14–16, ECF No. 42.)

Jones's argument is that the public wouldn't be concerned about the discrimination Riley raised because he "spoke during a workshop meeting about his own department, not as a whistleblower exposing systemic misconduct." (Jones Mot. 7); (Tr. Oral Arg. 4:11–18.) But a public employee's speech doesn't lose its value to the

public just because it embraces subject matter related to his job. *See Lane*, 573 U.S. at 240 (noting that such speech often "holds special value"). And Jones doesn't explain how the "workshop" nature of the meeting could cut against the public-concern element. In fact, the workshop meeting was open to the public, it was recorded for the public to view after the fact, and the agenda for the meeting specifically included time for Eddystone residents to speak. *See* (Feb. 5 Meeting Agenda at 1); (Tr. Oral Arg. 8:3–6.) If anything, the workshop-meeting forum enhanced the public nature of his speech. *See Snyder v. Phelps*, 562 U.S. 443, 456 n.4 (2011) (fact that speech occurs in public forum "heightens concerns that what is at issue is an effort to communicate to the public").

For their part, the Borough Defendants argue that Riley's comments did not implicate a matter of public concern because he spoke only to save his own job and because most of his grievances "did not involve discrimination." (Borough Mot. 14–15.) They cite no evidence in support of the latter assertion, so it's not clear what other grievances they believe Riley raised at the February 5 meeting. On the Court's own review of the meeting footage, Riley begins by introducing himself and briefly explaining the "cutthroat" and unfriendly tenor of the workplace, (Council Meeting 26:30–28:30), before spending most of the final three minutes of his five-minute speech recounting two instances of racial discrimination by his coworkers, (*id.* 28:30–28:50, 29:10–29:50), accusing Jones of sweeping his complaints about racism under the rug, (*id.* 28:50–29:10, 29:50–30:00), and arguing that it's unfair to fire him for reporting "bullying" and "racism," (*id.* 30:00–31:35). So contrary to the Borough Defendants' characterization, the reports of racial discrimination were core aspects of Riley's public remarks about his experience in the Streets department. And while Riley may well

9

have been trying to save his job, that's not enough on its own to change the character of Riley's speech from public to private. *See Rode*, 845 F.2d at 1201.

Third, since Riley spoke as a citizen about a matter of public concern, the First Amendment protects him from retaliation unless the Borough's "interest in maintaining an efficient workplace and avoiding disruption" outweigh the value of Riley's speech. *Baloga*, 927 at 756. The Defendants need not show that Riley's speech "caused actual disruption to [the Borough's] operations," but they must at least "establish likely disruption through record support," with more than "unadorned speculation as to the impact of speech." *Fenico*, 70 F.4th at 166.

Only Jones makes any argument that Riley's speech disrupted Borough operations. She contends that Riley's comments caused Streets Department staff to "view[] him as a snitch." (Jones Mot. 7.) Initially, this argument is legally unsound: "the public['s] . . . significant interest in encouraging legitimate whistleblowing," *Munroe*, 805 F.3d at 473, would be too easily undermined if the government could justify retaliating against whistleblowers by doing no more than pointing out that the whistleblowees are upset about it, *cf. Baloga*, 927 F.3d at 757 (holding evidence that plaintiff's "whining" was "bringing the morale . . . down" insufficient on its own to show disruption). And in any event, the argument has no factual support. Jones cites only to evidence showing that Riley's colleagues viewed him as a snitch for wearing a camera to work *before* the February 5 meeting. (Jones Mot. 7 (citing Ropski Dep. 9:9–24, 101–14.)) She cites no evidence that their view of Riley as a snitch was attributable to his February 5 speech.

10

2

Riley must next show that his February 5 speech "was a 'substantial' or 'motivating factor'" in his termination. *Baloga*, 927 F.3d at 759. He may do so by, among other methods, showing "an unusually suggestive temporal proximity" between his speech and termination. *Id.* If he makes that showing, the burden shifts to the Defendants to show that Riley would have been fired "even in the absence of the protected conduct." *Id.* (quoting *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000)).

Riley has met his initial burden. The one-week gap between his February 5 speech and February 12 termination is unusually suggestive temporal proximity on its own. *See Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 307 (3d Cir. 2012); *Baloga*, 927 F.3d at 759 n.15. And the timing is made even more suggestive by the fact that the Borough Council fired Riley as soon as it practicably could have after he spoke out. *See* (Jones Dep. 40:1–7); *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 792 (3d Cir. 2016) (suggesting that even a year-long gap might be unduly suggestive proximity because the plaintiff was a seasonal worker and the alleged retaliatory failure to rehire could not practicably have occurred any earlier).

To obtain summary judgment on causation grounds, then, the Defendants "must present evidence of such quality that no reasonable juror could conclude that the protected activity was the but-for cause of the termination." *Baloga*, 927 F.3d at 759 (quoting *Hill v. City of Scranton*, 411 F.3d 118, 126 n.11 (3d Cir. 2005)).[5] The primary

---

[5] As the Court has explained, some courts in retaliation cases under § 1983 hold that where a multimember body is the relevant decisionmaker, the plaintiff cannot establish causation unless a majority of the body's members were improperly motivated, *see Riley v. Borough of Eddystone*, No. CV 24-1835, 2024 WL 4137310, at *6 n.4 (E.D. Pa. Sept. 10, 2024) (citing *Watson v. Borough of Susquehanna*, 532 F. App'x 233, 236 (3d Cir. 2013)), while other courts hold that only a "deciding margin" of votes must be improperly motivated, *see id.* (citing *Scarbrough v. Morgan Cnty. Bd. of*

argument made by all Defendants is that Riley's poor behavior at work made his termination inevitable *before* he spoke out on February 5, and that the only reason the Council did not fire him before he did so is that they could not until the February 12 meeting. *See* (Borough Defs.' Mot. 18); (Jones Mot. 8); (Tr. Oral Arg. 18:21–22:4, 59:3–9.) On this record, however, a jury could conclude otherwise.

The agenda for the February 5 workshop meeting listed Riley's potential termination as an "action item," *see* (Feb. 5 Meeting Agenda at 2), so the Council was certainly going to *consider* the issue. But the record contains no evidence that before February 5, anyone on the Borough Council had made up his or her mind to vote in favor of firing him. The only Councilmember who appears to have given thought to his vote prior to February 5 is Bannon, who indicated in a February 1 email that he favored firing Riley. (Bannon Email Feb. 1, 2024 8:27 a.m.) Yet Bannon ultimately abstained from the vote, (Minutes February 12 Meeting), so he clearly had not made up his mind by February 5. The only other Councilmembers who apparently even knew about Riley's misconduct before February 5 were Perry, Stewart and Walker. (Jones Dep. 31:21–23); (Walker Feb. 1, 2024 8:33 a.m. Email, ECF No. 43-22); (Stewart Dep. 10:13–23.) Walker ultimately voted against firing Riley. (Minutes February 12 Meeting). Perry and Stewart ultimately voted in favor, (*id.*) but the record does not show that either had made up his mind before February 5.[6]

---

*Educ.*, 470 F.3d 250, 262 (6th Cir. 2006)). The parties inexplicably failed to brief this issue for a third time now. *See Riley*, 2024 WL 4844794, at *2 n.1 (flagging the issue for Riley's Title VII claims). The Court will once again refrain from choosing sides because, as explained below, the record doesn't foreclose a jury from concluding that all four individuals who voted to fire Riley would have voted differently absent his February 5 speech.

[6] Counsel for the Borough Defendants asserted at oral argument that Hughes also knew about Riley's misconduct before February 5. (Tr. Oral Arg. 63:3–64:15.) But she failed to cite any specific

12

A jury could also conclude that the Councilmembers would not ordinarily have viewed Riley's misconduct as meriting termination. Riley says Norm Quinn once "stormed over" to him "like he was ready to fight" and then "scream[ed]" at him and threatened to "fire [his] ass." (Riley Dep. 221:2–22.) Riley also says crew members often drove the trash route incorrectly, and he suspected that one of his coworkers sabotaged his garbage truck. (Riley Dep. 82:7–23, 109:15–113:22.) And, of course, Riley says his coworkers made racist comments to him. (*Id.* 99:16–23, 101:19–102:2, 130:21–139:7, 333:12–334:10.) Riley reported these incidents, (*id.* 93:14–94:2, 111:8–112:3, 139:14–23, 222:4–6,) but the Council apparently never considered terminating any Streets staff besides him. *See* (Feb. 5 Meeting Agenda at 2 (listing action item "pay increase for Norm Quinn and Mikey Dugan")); (Minutes Feb. 12 Meeting.) If Councilmembers were generally willing to tolerate misconduct by Streets employees, including threatening and mistreating their colleagues, a jury might reasonably doubt that the Council would have fired Riley for his misconduct.

B

The next issue is which Defendants may be held liable for the alleged violation of Riley's First Amendment rights. The individual Defendants may only be liable if they had "personal involvement" in the violation, *id.*, and even then they may have qualified immunity if the right they allegedly violated was not "clearly established" at the time of the conduct, *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 762 (3d Cir. 2019). And the Borough is only liable if it was the "moving force" behind the violation; *respondeat*

---

evidence in the record in support of that assertion, and the Court is unaware of any. Counsel conceded that Yannuzzi did not learn of Riley's misconduct until after February 5. (*Id.*)

13

*superior* is inapplicable. *Hightower v. City of Philadelphia*, 130 F.4th 352, 356 (3d Cir. 2025) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 694 (1978)).

1

Only Jones disputes her personal involvement in the alleged violation of Riley's rights. *See* (Jones Mot. 9–10, n.1.) A government official may in some cases be liable for First Amendment retaliation even if she was not the one who made the allegedly retaliatory decision. For example, a plaintiff may sue a "nonprosecuting official" for retaliatory prosecution if that official "acted in retaliation" and "induced the prosecutor to bring charges that would not have been initiated without his urging". *Hartman v. Moore*, 547 U.S. 250, 262 (2006); *see also Sims v. City of Madisonville*, 894 F.3d 632, 639–40 (5th Cir. 2018) (collecting authority for the proposition that a non-decisionmaker who retaliates against an employee by recommending termination may be liable for the termination). But here, Riley has adduced no evidence of any action taken by Jones that both induced the Borough Council to fire him and was motivated by his February 5 speech. When pressed at argument, the only actions by Jones that Riley's counsel identified as possibly inducing Riley's termination occurred *before* February 5. (Tr. Oral Arg. 37:9–40:5.) Those actions could not have been motivated by his speech and cannot render her liable for First Amendment retaliation. *See Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 275 (3d Cir. 2007) (defendant cannot retaliate for protected activity without knowledge of the protected activity).

2

The individual Councilmembers assert qualified immunity. "Qualified immunity shields government officials from civil damages liability unless the official violated a

statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citations omitted). A right is "clearly established" if "every reasonable official would have understood that what he is doing violates that right." *Id.* (cleaned up). That means "existing precedent must place the lawfulness of the particular [action] beyond debate." *D.C. v. Wesby*, 583 U.S. 48, 64 (2018). Only "controlling authority" or "a robust consensus of cases of persuasive authority" may place an issue beyond debate. *Id.* at 589–90.

The key questions for analyzing qualified immunity in First Amendment retaliation cases are (1) whether the law clearly established that a given action by the employer was sufficiently adverse, and (2) whether the law clearly established that the speech in question was protected. *See Mirabella v. Villard*, 853 F.3d 641, 653, 653 n.8 (3d Cir. 2017); *Lane*, 573 U.S. at 243.[7] The adverse action here was Riley's termination. And the speech in question was his public report of racial discrimination, which according to the record did not disrupt any public functions. So the relevant question is whether any reasonable official in February 2024 would believe he could fire an employee for making that speech.

No reasonable official could so believe. Prior to February 2024, it was clearly established that the government cannot fire an employee for speaking as a citizen on a matter of public concern unless the speech's disruptive effect on public operations

---

[7] The Councilmembers have not offered a helpful articulation of the right allegedly violated. They say that "no precedent" establishes that the Council "could not terminate a public employee [who] was scheduled for termination because prior to terminating him the employee spoke in a public forum and made claims that his reports of racism had not been heard and acted on properly." (Borough Defs.' Mot. 20); *see also* (Tr. Oral Arg. 65:20–23.) This mischaracterizes Riley's claim. He doesn't assert that his speech insulates him from termination; only that his speech cannot be the basis for his termination.

15

outweighed the value of the speech.  *See, e.g., Dougherty*, 772 F.3d at 993.  It was also clearly established that a public employee's speech outside the context of his job duties about arbitrary discrimination by public servants satisfies the citizen-speech and public-concern requirements.  *See, e.g., Rode*, 845 F.2d at 1201–02 (employee's statement to news reporter that "she was a victim of retaliation arising out of racial animus within the [Pennsylvania State Police]"); *Azzaro*, 110 F.3d at 978–80 (employee's reports to superiors of one-off instance of gender discrimination).  And it was clearly established that where speech satisfies the citizen-speech and public-concern elements and causes no disruption at all, the speech is protected.  *McGreevy v. Stroup*, 413 F.3d 359, 367 (3d Cir. 2005).  The Councilmembers thus are not entitled to qualified immunity.

### 3

Counsel for the Borough briefly contested municipal liability at oral argument, stating that "[t]here's no evidence of any type of municipal action here."  (Tr. Oral Arg. 57:13–14.)  But a municipality is liable for unconstitutional firings by officials with "final and unreviewable" authority over personnel decisions.  *See McGreevy v. Stroup*, 413 F.3d 359, 368–69 (3d Cir. 2005); *Hill v. Borough of Kutztown*, 455 F.3d 225, 245 (3d Cir. 2006).  And the Borough has never disputed that the Borough Council has final authority to fire employees.  *See* 8 Pa. Con. Stat. § 1005(1); *Riley*, 2024 WL 4137310, at *5 (noting that the Borough did not dispute this at the motion-to-dismiss stage).

IV

Riley also sues the Borough for retaliation in violation of Title VII and the PHRA.[8] These claims survive summary judgment largely for the same reasons as his First Amendment claim. To make out a *prima facie* case, Riley must show that (1) he engaged in protected employee activity; (2) the Borough took an adverse employment action either after or contemporaneous with the protected activity; and (3) there is a causal connection between the protected activity and the adverse action. *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 193 (3d Cir. 2015). If he establishes all three elements, the burden shifts to the Borough to articulate some "legitimate, non-retaliatory reason for having taken the adverse action." *Id.* Once the Borough articulates such a reason, the burden shifts back to Riley "to demonstrate that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Id.* (internal quotation marks omitted).

Riley asserts, and the Borough apparently no longer disputes, that his comments at the February 5 workshop meeting constituted protected employee activity under Title VII. *See* (Borough Defs.' Mot. 11–12).[9] The Borough also obviously does not dispute that termination is an adverse employment action. (*Id.*) And just as with

---

[8] The Court analyzes the Title VII and PHRA claims together because their provisions are coextensive. *Qin v. Vertex, Inc.*, 100 F.4th 458, 470 (3d Cir. 2024).

[9] The Borough's concession appears to be based on a misunderstanding of what constitutes protected employee activity for Title VII purposes. Its brief suggests that the key question for determining whether Riley's February 5 speech was protected is whether Riley spoke on a matter of public concern. (Borough Defs.' Mot. 12.) The public-concern question is important for determining *First Amendment* protection, but as the Court has explained in its two prior opinions in this case, whether *Title VII* protects Riley's February 5 speech depends on whether he reasonably and in good faith believed that the racist conduct he was reporting to the Council constituted a hostile work environment or other Title VII violation. *See Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006).

Riley's First Amendment claim, the unusually suggestive temporal proximity between his February 5 speech and February 12 termination satisfies the *prima facie* causal-connection element. *See Dondero v. Lower Milford Twp.*, 5 F.4th 355, 362 (3d Cir. 2021) (using Title VII and § 1983 precedent on temporal proximity interchangeably); *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 307 (3d Cir. 2012) (same).

The Borough's burden to articulate a legitimate, non-retaliatory reason for firing Riley is "relatively light" — it "need not prove that the articulated reason actually motivated" Riley's firing. *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 n.2 (3d Cir. 1997). The Borough again says that the reason the Council voted to fire Riley was his misconduct at work; namely, stealing rock salt, playing video games at work, and wearing a body camera to work while threatening his colleagues. (Borough Mot. 10, 14.)

So the burden shifts back to Riley "to demonstrate "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the Borough's explanation. *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 262 (3d Cir. 2017) (quoting *Daniels*, 776 F.3d at 199). He may proceed to trial if a jury could conclude that the Borough's explanation is "unworthy of credence, and hence infer that the employer did not act for the asserted non-retaliatory reasons." *Id.* (cleaned up). As explained, a jury here could so conclude: the record does not establish that anyone on the Council had made up their mind before February 5 to vote in favor of firing Riley, nor does it establish that Riley's behavior was the kind of behavior for which the Council would have certainly fired him in ordinary circumstances.[10]

---

[10]   Courts are also split over the "majority" and "deciding margin" rule in Title VII cases, but for the reasons explained *supra* note 5, the Court need not choose sides.

18

V

Riley's intentional-discrimination claims under Title VII and PHRA claims, however, do not survive summary judgment. To make out a *prima facie* case, he must show (1) he is a member of a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 169 (3d Cir. 2013). He cannot establish the fourth element.

An inference of discrimination may follow from, *inter alia*, evidence that similarly situated comparators were treated more favorably by their employer. *See Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 703 n.2 (3d Cir. 2010). A plaintiff must show that the alleged comparator was similarly situated "in all relevant respects," including that the comparator engaged in similar misconduct. *See Durst v. City of Phila.*, 798 F. App'x 710, 713 (3d Cir. 2020); *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 881–82 (3d Cir. 2011); *Doe v. Apria Healthcare Grp. Inc.*, 97 F. Supp. 3d 638, 645 (E.D. Pa. 2015).

Riley seeks to take the comparator route, arguing only that Riley "complained of racial discrimination only to be told he was no longer needed, while his white coworker [John Caponi,] who used racial slurs against him[,] continued to work." (Resp. to Borough to Defs. 5, ECF No. 47); (Tr. Oral Arg. 72:15–17.) But Riley makes no attempt to show that Caponi and Riley were similarly situated in all relevant respects. In fact, counsel conceded that they were not. (Tr. Oral Arg. 73:12–74:11.)

An appropriate Order follows.

BY THE COURT:

***/s/ Gerald J. Pappert***

Gerald J. Pappert, J.